United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| MARIA ESCALERA, et al.,<br>Plaintiffs,<br>v.<br>CITY OF SAN PABLO, et al.,<br>Defendants. | Case No. 23-cv-06491-LB<br><br>**ORDER GRANTING SUMMARY JUDGMENT**<br><br>Re: ECF No. 98 |

## INTRODUCTION

On December 15, 2021, a 911 caller reported that a man in the parking lot of a market in San Pablo, standing next to a red Toyota truck, was holding a black handgun, removing and reinserting its magazine. A San Pablo police officer responded, saw a man (later identified as decedent Sergio Escalera-Valdez) driving from the parking lot in a red truck, and followed him. The decedent sped up and drove erratically but ultimately stopped after the officer activated his lights and siren. Other officers arrived. After he was commanded to do so, the decedent put his empty (but bloody) hands out the window. After further commands, he got out of the car, holding what appeared to be a firearm in his right hand but was in fact a replica BB gun that looked like a real gun. Video footage shows that the decedent appeared to rack the slide and turned toward the officers as they fired the first shot. Four officers fired ten shots in about two seconds, hitting the decedent, who died from his injuries, despite efforts to save his life.

The plaintiffs are the decedent's parents and successors in interest. They sued the officers for their use of deadly force under 42 U.S.C. § 1983 and state law, claiming (1) excessive force in violation of the Fourth Amendment (against four officer defendants), (2) interference with familial rights in violation of the Fourteenth Amendment (against the officers), (3) negligence (against the officers and the City of San Pablo), and (4) battery (against the officers).[1] The defendants moved for summary judgment, arguing that the use of force was lawful and the officers have qualified immunity for the federal claims and state statutory immunity for the state claims.[2] The court grants summary judgment. The video evidence is uncontroverted. The officers' conduct, which took seconds, was objectively reasonable given the decedent's racking the gun and turning with it toward the officers. Alternatively, the offices have immunity under federal and state law.

## STATEMENT

### 1. The Incident

On December 15, 2021, at 2:27 p.m., an employee at Evergreen Market in San Pablo, California, called 911, reporting that a man in the market's parking lot (described as a white-presenting male in his forties wearing a grey jacket and sunglasses) was standing next to a red Toyota Tacoma pickup truck, holding a black gun, taking the magazine in and out of the gun. During the call, the employee said that the man had left the parking lot in the truck.[3]

Dispatch relayed the report, including the description of the man and the truck, to San Pablo Police Department officers, who responded to the parking lot.[4] Officer (and defendant) Shaun Swaleh saw a red pickup truck leaving the lot and followed it.[5]

---

[1] Second Am. Compl. – ECF No. 28. The court dismissed the plaintiffs' claim against Umarex, the manufacturer and distributor of the BB gun. Order – ECF No. 80. The plaintiffs dismissed their *Monell* claims. Dismissal – ECF No. 97. Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents and to transcript pages.

[2] Mot. – ECF No. 98.

[3] 911 Call, Ex. B to Blechman Decl. – ECF No. 98-1; Dispatch Audio, Ex. C to *id.*

[4] Dispatch Audio, Ex. C to Blechman Decl. – ECF No. 98-1; CAD Report, Ex. D to *id.*; Rios Dep., Ex. O to *id.* at 154–55 (pp. 69:9–70:3).

[5] Swaleh Dep., Ex. E to Blechman Decl. – ECF No. 98-1 at 45–47 (pp. 69:10–70:3; 74:11–14).

United States District Court
Northern District of California

The truck accelerated, fishtailing, and Swaleh activated his lights and siren.[6] The truck stopped in the middle of a traffic lane.[7] Swaleh stopped about twenty feet behind the truck, retrieved his rifle from the passenger seat, opened the driver's side door of his vehicle, stood behind the door, aimed the rifle at the decedent, and ordered him several times to show his hands. The decedent did not comply.[8] Six police officers arrived, including defendants Waseemah Ali, Monica Martinez (formerly Louis), and Javier Rios, positioning themselves behind the open driver-side and passenger-side doors of Swaleh's car as Swaleh issued his commands.[9] The decedent responded, "no," at least once.[10]

The driver eventually put both of his hands, which were empty and had blood on them, outside the driver-side window.[11] Officers then gave multiple commands for the decedent to get out of the truck and show his hands.[12] According to the defendants' police-practices expert and the officers, during a high-risk traffic stop, a single officer should give commands with specific directives, such as by turning off the ignition and throwing the keys out the car.[13]

The decedent then got out of the truck, holding a black gun in his right hand near waist level. With his other hand, he appeared to rack the slide (thus loading the gun), moving the gun toward the

[6] *Id.* at 48–49 (pp. 75:18–76:7), 51 (pp. 79:2–6).

[7] *Id.* at 52 (pp. 80:4–14); Swaleh Vehicle Footage, Ex. G to Blechman Decl. – ECF No. 98-1.

[8] Swaleh Dep., Ex. E to Blechman Decl. – ECF No. 98-1 at 53–54 (pp. 84:8–85:11); Body-Worn Camera Video, Ex. F to *id.*; Video Sync, Ex. M-2 to *id.*

[9] Body-Worn Camera Video, Exs. F–L to Blechman Decl. – ECF No. 98-1; Swaleh Dep., Ex. E to *id.* at 55 (pp. 86:8–20); Martinez Dep., Ex. N to *id.* at 123 (pp. 51:20–24), 123–24 (pp. 54:19–55:6); Rios Dep., Ex. O to *id.* at 158–59 (pp. 87:1–88:22); Ali Dep., Ex. P to *id.* at 177–78 (pp. 18:21–19:8).

[10] Swaleh Dep., Ex. E to Blechman Decl. – ECF No. 98-1 at 57 (pp. 88:6–16).

[11] *Id.* at 56 (pp. 87:14–22), 64 (pp. 111:24–25); Rios Dep., Ex. O to Blechman Decl. – ECF No. 98-1 at 160 (pp. 92:3–24).

[12] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1.

[13] Opp'n – ECF No. 103 at 3 (making this point and citing Fonzi Dep., Ex. 6 to Cajina Decl. – ECF No 103-1 at 118–22 (pp. 51:2 – 56:17)); Swaleh Dep., Ex. 1 to Cajina Decl. – ECF No. 103-1 at 8–10 (pp. 109:21–111:22); Rios Dep., Ex. 2 to *id.* – ECF No. 103-1 at 47–50 (pp. 91:17–100:23)); Body-Worn Camera Video, Exs. F–L to Blechman Decl. – ECF No. 98-1.

center of his torso.[14] He took his left hand off the gun and, still holding it in his right hand, began turning his body and the gun clockwise in the direction of the officers. He pointed the gun horizontally but never directly at the officers. Officers Ali, Martinez, Swaleh, and Rios fired ten shots in about two seconds, three rounds each for Martinez, Swaleh, and Rios and one for Officer Ali.[15] It is undisputed that no officer commanded the decedent to drop the gun or gave a warning before firing.[16] The decedent fell to the ground, dropping the gun near his right hand.[17] Officers then kicked the firearm away, handcuffed the decedent, and began lifesaving measures. The decedent died from his injuries that day.[18]

About three seconds elapsed between the decedent's exiting the truck and the first shot.[19] The plaintiffs' video expert Bryan Reuter testified that the ten shots were fired in about two seconds, with the last three in the last 0.45 seconds of the shooting, after the decedent had "hit the ground." He testified, and the video corroborates, that the decedent was still moving after the final gunshot.[20] Officer Ali testified that at least two shots were fired after the decedent was on the ground.[21]

Mr. Reuter conceded that, after reviewing the body-worn camera footage, Mr. Escalera-Valdez rotated his body and the firearm clockwise, in the direction the officers were located.[22] The

---

[14] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1 at 1:13–1:15; Swaleh Dep., Ex. E to *id.* at 59 (pp. 99:1–16); Martinez Dep., Ex. N to *id.* at 128–29 (pp. 66:11–67:6); Rios Dep., Ex. O to *id.* at 162 (pp. 99:1–12).

[15] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1; Body-Worn Camera Footage, Exs. F, H, J, K to *id.*; Hearn Decl., Ex. Q-1 to *id.* at 201–02 (¶¶ 1–2); Rios Dep., Ex. O to *id.* at 164 (pp. 101:9–15), 166 (pp. 107:11–17); Martinez Dep., Ex. N to *id.* at 129–30 (pp. 67:7–68:4); Swaleh Dep., Ex. E to *id.* at 60–61 (pp. 102:24-103:1); Ali Dep., Ex. P to *id.* at 187–88 (pp. 48:4–49:9); Clark Dep., Ex. CC to *id.* at 540 (pp. 118:3–22).

[16] Opp'n – ECF No. 103 at 4, 8; Reply – ECF No. 107 at 11–12.

[17] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1.

[18] Swaleh Dep., Ex. E to Blechman Decl. – ECF No. 98-1 at 62–63 (pp. 105:21–106:4); Coroner's Inquest Tr., Ex. Q to *id.* at 194 (pp. 23:10–16).

[19] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1.

[20] Reuter Dep., Ex. BB to Blechman Decl. – ECF No. 98-1 at 482–83 (pp. 39:9–40:18), 484–88 (pp. 41:13–45:22), 492–94 (pp. 70:19–72:3), 497 (pp. 83:4–7); Video Sync., Ex. M-2 to *id.*

[21] Ali Dep., Ex. 4 to Cajina Decl. – ECF No. 103-1 at 81 (pp. 44:4–11).

[22] Reuter Dep., Ex. BB to Blechman Decl. – ECF No. 98-1 at 498–500 (pp. 98:10–100:2), 501–02 (pp. 104:15–105:12), 508–27 (pp. 111:17–130:7).

United States District Court
Northern District of California

plaintiffs' police-practices expert Roger Clark conceded that a movement to rack the slide of a gun puts a round in the chamber of the gun, making the gun useable.[23]

The decedent's gun was a Colt Defender BB gun, which the plaintiffs allege is "meant to look precisely like actual handguns" and is "indistinguishable at a distance from the actual 9 mm Colt Defender handgun manufactured by Colt."[24] The officer-defendants testified that they believed it was a real gun.[25]

The Contra Costa County District Attorney's Office investigated the shooting and determined the officers involved were "justified in their use of lethal force."[26]

**2. Autopsy and Toxicology Findings**

An autopsy showed seven gunshot wounds. One gunshot wound of the abdomen caused death.[27] The decedent had a blood-alcohol content of 0.210 and THC and methamphetamine in his system.[28]

**3. The Decedent's Mental State**

The defendants present evidence that the decedent was suicidal and provoked the use-of-force encounter with the officer-defendants, intending to end his life. The morning of the shooting, the decedent visited his parents and told his father, "I can't continue living." His parents believed he had come to say goodbye.[29] Later that same day, he gave his necklace to his cousin's girlfriend to give to his cousin, hugged her, and cried.[30] Shortly before the shooting, an employee at Evergreen

---

[23] Clark Dep., Ex. CC to Blechman Decl. – ECF No. 98-1 at 533–37 (pp. 86:2–90:3), 538–39 (pp. 109:24–110:5).

[24] Second Am. Compl. – ECF No. 28 at 6 (¶ 26).

[25] Swaleh Dep., Ex. E to Blechman Decl. – ECF No. 98-1 at 66–67 (pp. 114:22–115:9), 68 (pp. 117:13–18); Rios Dep., Ex. O to *id.* at 152–53 (pp. 60:10–61:21).

[26] DAO Report, Ex. Y to Blechman Decl. – ECF No. 98-1 at 32; Mot. – ECF No. 98 at 14.

[27] Coroner's Inquest Tr., Ex. Q to Blechman Decl. – ECF No. 98-1 at 195–98 (pp. 24:12–26:2, 27:6–11).

[28] *Id.* at 197–98 (pp. 26:18-27:5).

[29] Manuel Escalera Dep., Ex. S to Blechman Decl. – ECF No. 98-1 at 210–11 (pp. 25:24–26:17), 214 (pp. 29:5–15); Maria Escalera Dep., Ex. T to *id.* at 220 (pp. 32:19–23).

[30] Pinones Dep., Ex. V to Blechman Decl. – ECF No. 98-1 at 240–42 (pp. 15:20–16:9, 17:12–25).

Market saw the decedent sitting in his truck, crying. The decedent told the employee that he was thinking about committing suicide and letting the police do it for him.[31] The defendants' psychological expert Kris Mohandie opined that the decedent committed "suicide by cop." She conceded that the officers were not aware of the decedent's mental state or intentions at the time of the incident.[32]

### 4. Procedural History

Four claims remain: (1) excessive force in violation of the Fourth Amendment to the U.S. Constitution (against the four officers); (2) interference with familial relationship in violation of the Fourteenth Amendment (against the four officers); (3) negligence (in the form of wrongful death (against the officers and the City of San Pablo); and (4) battery (against the officers).[33] The defendants moved for summary judgment on all claims.[34]

The parties consented to magistrate-judge jurisdiction.[35] 28 U.S.C. § 636(c)(1). The court held a summary-judgment hearing on July 30, 2026.

## SUMMARY-JUDGMENT STANDARD

Summary judgment must be granted where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

---

[31] Madrid Dep., Ex. W to Blechman Decl. – ECF No. 98-1 at 248–52 (pp. 13:2–14:6, 14:13–21, 15:24–16:17, 17:11–21).

[32] Mohandie Dep., Ex. 8 to Cajina Decl. – ECF No. 103-1 at 139–42 (24:1–26:21).

[33] Second Am. Compl. – ECF No. 28; Order (dismissing claims against Umarex); Dismissal – ECF No. 97 (dismissing *Monell* claims).

[34] Mot. – ECF No. 98. The defendants object to some of the plaintiffs' fact submissions as improper personal commentary, legal conclusions, and citations of defense counsel's arguments in a different case. Reply – ECF No. 107 at 19. The court does not rely on these evidentiary submissions.

[35] Consents – ECF Nos. 9, 12, 26.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

If the moving party meets its initial burden, then the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence but instead must produce admissible evidence that there is a genuine issue of material fact for trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). But where the record contains video evidence of the events at issue, and the nonmoving party's version of the events is "blatantly contradicted" by that video evidence, the court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

**ANALYSIS**

The defendants move for summary judgment on all claims on the grounds that their use of force was reasonable and they in any event have qualified immunity for the federal claims and state statutory immunity for the state claims.[36] Summary judgment is granted on these grounds.

---

[36] Mot. – ECF No. 98 at 21–24.

**1. Fourth Amendment — Claim One**

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)).

"Determining whether the force used to effect a particular seizure is reasonable . . . requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (cleaned up). A court must evaluate "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The most important *Graham* factor is the immediate threat to anyone's safety. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).

The *Graham* factors are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011), courts must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*," *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (cleaned up). Other factors relevant to the analysis include the availability of less intrusive alternatives to the force used and giving proper warnings before using force, if feasible. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). "The absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014).

Deadly force is reasonable only if an officer has "probable cause to believe that the suspect poses a threat of serious harm, either to the officers or to others[.]" *Garner*, 471 U.S. at 11. "If the person is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness" must allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Each application of force must be justified at the time it is used. If officers are justified in firing to end a severe threat, they "need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). But "terminating a threat doesn't necessarily mean terminating the suspect." *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). Where a suspect "is on the ground and appears wounded," the suspect "may no longer pose a threat" and a reasonable officer "would reassess the situation rather than continue shooting." *Id.*; *accord Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 795, 804 (9th Cir. 2025).

Preliminarily, the parties dispute the relevance of the defendants' evidence that the decedent intended to provoke the officers' use of force.[37] The defendants did not know about the suicide risk or the decedent's mental health.[38] The Fourth Amendment standard is objective reasonableness. *Blankenhorn*, 485 F.3d at 477. "Only information known to the officer at the time the conduct occurred is relevant." *Nehad*, 929 F.3d at 1132 (citing *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017)). The evidence is not relevant. *Cf. Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014) (a clear and obvious suicide-by-cop tendency can be relevant to understand the circumstances that the officers faced).

In any event, the conduct that matters is the decedent's conduct with the gun in the seconds before the shooting, which is established by the video evidence.

The facts are not genuinely disputed. The plaintiffs concede that the decedent got out of the truck, holding what looked like a firearm, racked the gun, and turned toward the officers, raising the

---

[37] *Id.* at 23–24; Opp'n – ECF No. 103 at 5–6; Reply – ECF No. 107 at 6–8.

[38] Mohandie Dep., Ex. 8 to Cajina Decl. – ECF No. 103-1 at 139–42 (24:1–26:21) (the plaintiffs' expert conceded this point).

United States District Court
Northern District of California

gun in the moments before the shooting.[39] The plaintiffs assert that there is a triable issue of fact that the decedent was "attempt[ing] to raise his hands in compliance with the commands issued by the officers to show his hands."[40] The video evidence contradicts this characterization. The court thus "views the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–381. The outcome would be different if the videos did not provide "dispositive evidence" or were capable of more than one interpretation. *Cf. George*, 736 F.3d at 835-36. It also does not matter that the decedent never pointed the gun directly at the officers.[41] The video evidence establishes that the decedent was rotating the gun toward the officers before the shooting.

The only issue is whether the use of deadly force was objectively reasonable. It was.

The most important *Graham* factor — whether the suspect posed an immediate threat to anyone's safety — decisively favors the officers. The offices responded to a 911 call about a man manipulating a gun in a public parking lot. In response to officer commands, he responded "no" once, and showed his bloody hands, suggesting harm to himself or others. When he did leave the truck, he held what appeared to be a handgun, racked the slide (suggesting that it could be fired), and raised the gun in the direction of the officers, who were twenty feet away.[42] A reasonable officer in these circumstances would have probable cause to believe that the decedent posed an imminent and serious threat to the officers' safety. *Garner*, 471 U.S. at 11; *George*, 736 F.3d at 838; *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (it is "unquestionably reasonable" to use deadly force against a suspect who makes a threatening gesture like reaching for the area of a suspected weapon).

[39] Opp'n – ECF No. 103 at 3 ("Mr. Escalera-Valdez ultimately exited the vehicle holding what appeared to be a firearm in his right hand."), 7 (the officer-defendants "saw what appeared to be a firearm in his hands" and "the Decedent attempted to raise his hands in compliance with the commands issued by the officers to show his hands"), 11 (Mr. Escalera-Valdez "manipulated the weapon in a manner which officers interpreted as loading the gun."); Reuter Dep., Ex. BB to Blechman Decl. – ECF No. 98-1 at 498–500 (pp. 98:10–100:2), 501–04 (pp. 104:15–107:19), 519–22 (pp. 122:14–125:19).

[40] Opp'n – ECF No. 103 at 7, 8.

[41] Rios Dep., Ex. O to Blechman Decl. – ECF No. 98-1 at 164 (pp. 101:9–15); Martinez Dep., Ex. N to *id.* at 129 (pp. 67:7–21); Clark Dep. Tr., Ex. CC to *id.* at 540 (pp. 118:3–22).

[42] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1.

The other *Graham* factors also favor the officers. The decedent refused to comply with police commands, got out of the truck with the gun, racked it, and pivoted toward the officers raising it.[43] What began as a misdemeanor brandishing of the gun at the market, Cal. Penal Code § 417(a)(1), and a subsequent misdemeanor failure to stop, *id.* § 148(a)(1), became a felony assault against the officers, *id.* § 245(d)(1). The officers' use of force was objectively reasonable under these circumstances.

The plaintiffs point to the officers' failure to order the decedent to drop the gun or to warn him that they would use force.[44] Neither argument creates a triable issue of fact. While warnings are relevant to the use-of-force analysis, they are required only "when feasible." *Glenn*, 673 F.3d at 876; *Deorle*, 272 F.3d at 1284. Only three seconds elapsed between the decedent's exiting the car with the gun and the first shot. The threat he posed increased when he racked the slide, raised the gun, and pivoted in the officers' direction.[45] In that interval, it was not feasible or practical to issue a warning. *Graham*, 490 U.S. at 396–97. The suggestion that they should have is hindsight, not an allowance for the split-second judgments that reasonable officers must make on the scene. *Id.*

The plaintiffs' cited authorities do not change this analysis.

In *Johnson v. Myers*, the decedent had a pocketknife (not a firearm), and there were genuine disputes as to whether the decedent threatened the officers or anyone else, was resisting arrest, and comprehended the officers' overlapping commands, and whether less-lethal measures were available. 129 F.4th 1189, 1195–96 (9th Cir. 2025). *Lopez* is distinguishable too: there was no video evidence there, the decedent was a child who was sixty feet away with a toy gun, and there were fact issues about the gun's position.[46] *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1006–07 (9th Cir. 2017). And in *Hermosillo v. County of Orange*, the plaintiffs' evidence was that the decedent was unarmed and walked toward the officers with his hands up, stopping at least twelve feet away. 562 F. Supp. 3d 802, 812–13 (C.D. Cal. 2021). By contrast here, the video evidence

---

[43] *Id.*

[44] Opp'n – ECF No. 103 at 7.

[45] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1.

[46] Opp'n – ECF No. 103 at 7 (citing *Lopez*).

United States District Court
Northern District of California

contradicts the plaintiffs' characterization that the decedent was raising his hands to comply with the officers' commands. As a matter of law, the initial shots were objectively reasonable.

The issue then is whether the last three shots were objectively reasonable. The plaintiffs contend that they were not because they were fired when the decedent was "on the ground and incapacitated."[47] All shots were fired in a continuous two-second volley, with the final shots in the final 0.45 seconds. The decedent was still moving. The gun was near his right hand.[48] No evidence suggests that the threat had ended. *Plumhoff*, 572 U.S. at 777. A 0.45 interval did not allow a reassessment of the use of force. *Zion*, 874 F.3d at 1076; *Hernandez*, 139 F.4th at 795, 804.

In *Zion*, by contrast, the officer fired nine shots at the decedent from fifteen feet away, fired nine more shots from four feet away (when the decedent was down), and took a running start and stomped on the decedent's head three times. Qualified immunity applied to the first nine shots but not the subsequent uses of force because disputes of fact existed about whether there was a continuing threat. 874 F.3d at 1075. Similarly, in *Hernandez*, the Ninth Circuit found qualified immunity for deadly force against a knife wielder for two volleys but denied it for the last volley (six shots over six seconds) when the suspect was apparently shot and was on the ground, and fact disputes existed about whether he was a continuing threat. 139 F.4th at 795, 804. The shooting here by contrast was an objectively reasonable response to an ongoing threat. *Plumhoff*, 572 U.S. at 777.

In any event, the officers are entitled to qualified immunity.

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mattos*, 661 F.3d at 440 (cleaned up) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity, an officer will be protected from suit when he

---

[47] *Id.* at 8.

[48] Video Sync, Ex. M-2 to Blechman Decl. – ECF No. 98-1; Reuter Dep., Ex. BB to *id.* at 484–88 (pp. 41:13–45:22), 492–94 (pp. 70:19–72:3).

or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017) (cleaned up). "The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 150–51 (cleaned up). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 152.

In determining whether an official is entitled to qualified immunity, courts consider (1) whether the official violated a constitutional right of the plaintiff and (2) whether that constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440. Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id.* (citing *Pearson*, 555 U.S. at 235). Clearly established law must not be defined at a "high level of generality"; in excessive force cases, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (cleaned up). The plaintiff "bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

The plaintiffs have not identified a case that squarely governs the facts at issue here. *Kisela*, 584 U.S. at 105. No case as of December 2021 clearly established that the officers violated the Fourth Amendment by a continuous two-second volley at a suspect who got out of a car with a firearm, racked the slide, and rotated it toward the officers, twenty feet away. The plaintiffs' authority is distinguishable.[49] *Zion* (discussed above) denied qualified immunity when the officer fired a second round of nine shots at a knife-wielding decedent, who was already down, and then stomped on his head three times. The video showed that the decedent "show[ed] no signs of getting up," and a reasonable juror could conclude the decedent no longer posed an immediate threat. 874 F.3d at 1076. By contrast, after the continuous two-second volley here, the decedent

[49] Opp'n – ECF No. 103 at 7–10.

continued to move, and the apparently real gun was close to his hand. *Lopez* (also discussed above) involved disputes of fact about whether the decedent (a child with a toy gun) posed a risk. 871 F.3d at 1020–22.

Out-of-circuit authority similarly is distinguishable. *Gradisher v. City of Akron* involved disputes of fact about whether the plaintiff had a weapon and was resisting arrest. 794 F.3d 574, 585 (6th Cir. 2015). *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014), and *Morrison v. Bd. of Trs.*, 583 F.3d 394, 408 (6th Cir. 2009), involved use of force after the plaintiffs had been handcuffed. *Robinson v. Lambert*, 753 Fed. App'x 777, 780 (11th Cir. 2018), and *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), concerned use-of-force incidents that took place inside of correctional facilities and involved different facts. In *Kulpa v. Cantea*, 708 Fed. App'x, 846, 853 (6th Cir. 2017) — another case involving a correctional facility — the officer knelt on the plaintiff's back while the plaintiff was handcuffed and in a prone position.

The cases do not "squarely govern[]" the facts here, where it is undisputed that the decedent was armed with what appeared to be a real handgun, racked it, and pivoted toward the officers, resulting in a continuous two-second volley in reaction to an apparent risk. Qualified immunity applies.

Summary judgment is granted as to the plaintiffs' excessive-force claim.

**2. Fourteenth Amendment**

The Fourteenth Amendment's substantive due-process clause protects against the arbitrary or oppressive exercise of government power. *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Parents and children may assert Fourteenth Amendment substantive due-process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (parents and children); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991) (parent).

The standard that a plaintiff must satisfy to establish a due-process violation under the Fourteenth Amendment is higher than the standard for excessive-force claim under the Fourth

Amendment. Whereas an alleged Fourth Amendment violation is evaluated under a reasonableness standard, *Ohio v. Robinette*, 519 U.S. 33, 34 (1996), "the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (cleaned up); *accord Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation.") (citing *Lewis*, 523 U.S. at 846). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). If the deliberate-indifference standard applies, the plaintiffs must show that the officers acted with "conscious or reckless disregard of the consequence[s] of [their] acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230.

In *Zion*, the Ninth Circuit rejected an argument that the "deliberate indifference" standard applied where the police officer fired a total of eighteen shots at the victim, half of them at close range, while the suspect was already on the ground. 874 F.3d at 1077. The Ninth Circuit instead applied the heightened "purpose to harm" standard, holding that the police officer's shots came in rapid succession without time for reflection. *Id.* "Whether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect" and thus did not violate the Fourteenth Amendment. *Id.*

The court's Fourth Amendment analysis requires summary judgment here: if the force was objectively reasonable, as it was here, then the heightened "purpose to harm" does not create liability.[50] In any event, there is no evidence that the defendants acted with a purpose to cause harm unrelated to legitimate law-enforcement objectives. *Hayes*, 736 F.3d at 1230. The video

[50] The parties do not dispute that the standard is "purpose to cause harm." Mot. – ECF No. 98 at 28–29; Opp'n – ECF No. 103 at 11–12; Reply – ECF No. 107 at 16–17.

shows a two-second response to an imminent threat to officers. Self-defense and defense of fellow officers are legitimate law-enforcement objectives. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453–54 (9th Cir. 2013).

Summary judgment is granted on the Fourteenth Amendment claim. The officers also are entitled to qualified immunity for the reasons set forth in the last section.

**3. State-Law Claims**

To prevail on their state claims for negligence and battery, the plaintiffs must show that the force was unreasonable. The force was reasonable. The officers in any event are immune under California law.

To prove negligence in the use of deadly force, a plaintiff "must prove unreasonable force as an element of the tort." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998). Negligence under California law is "broader than federal Fourth Amendment law" and includes consideration of an officer's conduct before force is applied, such as pre-shooting tactics. *Hayes v. County of San Diego*, 57 Cal. 4th 622, 639–40 (2013). "California law does not require officers to choose the most reasonable action or the conduct least likely to cause harm" but provides officers with "a degree of discretion as to how they choose to address a particular situation." *J.A.L. v. Santos*, 724 F. App'x 531, 534 (9th Cir. 2018) (cleaned up).

"[A]n assault and battery claim against a police officer requires that unreasonable force be established." *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010) (citing *Edson*, 63 Cal. App. 4th at 1272).

As discussed above, the use of force was an objectively reasonable response to an imminent threat, which disposes of the battery claim. The plaintiffs point to two shortcomings in the officers' conduct before the shooting: (1) multiple officers gave commands to the decedent (when police training provides that only one officer should give commands during high-risk traffic stops), and (2) the decedent was not directed how to comply (such as by turning of the truck's

ignition and tossing the keys out of the vehicle).[51] As discussed above, three seconds elapsed before the shots, which occurred over the next two seconds. Warnings were not feasible. The reaction to the imminent threat does not render the multiple commands negligent.

The defendants in any event are immune from liability.

Homicide is "justifiable" when the officer's use of force complies with Cal. Penal Code § 835a. Cal. Penal Code § 196. The test for whether the use of force is justifiable under section 196 is whether the circumstances "reasonably created a fear of death or serious bodily harm to the officer or to another." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 524 (2009). There is no civil liability for justifiable homicide under California law. *Martinez v. County of L.A.*, 47 Cal. App. 4th 334, 349 (1996). The shooting was justified here as a response to a reasonably perceived threat of death or serious bodily injury to the officers, who thus are immune under Cal. Penal Code § 196.

There also is no liability for injuries caused to a person resisting arrest in circumstances like those here. Cal. Gov't Code § 845.8(b). The decedent was apparently armed and threatened the officers.

Immunity also applies when officers use due care and are not negligent in their use of deadly force in executing or enforcing the law. Cal. Gov't Code § 820.4. The officers were not negligent.

Summary judgment is granted on the state claims.

## CONCLUSION

Summary judgment is granted to the defendants on all claims. This resolves ECF No. 98.

**IT IS SO ORDERED.**

Dated: July 30, 2026

LAUREL BEELER
United States Magistrate Judge

[51] Opp'n – ECF No. 103 at 3.